# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BULLSEYE TELECOM, INC.,

      Plaintiff,                              Case No. 06-13571

v.                                                Hon. Gerald E. Rosen

GLOBAL CROSSING BANDWIDTH, INC.,

      Defendant.
_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS OR STAY PROCEEDINGS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    September 24, 2007

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

Plaintiff BullsEye Telecom, Inc. commenced this action in state court on May 11, 2006, asserting breach-of-contract and other claims arising from a Carrier Service Agreement and other contractual arrangements allegedly entered into with Defendant Global Crossing Bandwidth, Inc. On August 8, 2006, Defendant removed the case to this Court, citing diversity of citizenship and Plaintiff's apparent assertion of a claim arising under the federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* Plaintiff then filed an amended complaint on October 10, 2006, adding claims of tortious interference

with contractual relations and with prospective economic relations.

By motion filed on October 31, 2006, Defendant requests that this case be either stayed or dismissed pending arbitration of the parties' disputes. In support of this motion, Defendant contends that all of the issues raised in Plaintiff's complaint are covered by a Dispute Resolution Agreement ("DRA") entered into between the parties, and thus must be submitted to arbitration in accordance with the terms of the DRA. Plaintiff filed a response in opposition to Defendant's motion on November 27, 2006, arguing that the DRA's arbitration provisions are unenforceable by virtue of the parties' failure to satisfy one of the preconditions to arbitration — namely, mutual agreement upon an arbitrator. On December 6, 2006, Defendant filed a reply in further support of its motion.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, the accompanying exhibits, and the record as a whole, the Court finds that the relevant facts, allegations, and legal arguments are adequately presented in these written materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. For the reasons stated below, the Court finds that this motion must be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Global Crossing Bandwidth, Inc. is a wholesale interexchange (long distance) carrier that offers telecommunications services in bulk to local exchange carriers such as Plaintiff BullsEye Telecom, Inc. The local exchange carriers, in turn,

combine Defendant's and their own services to offer a package of telecommunications services to their end-user customers.

In the spring of 2001, the parties entered into a Carrier Service Agreement ("CSA"), pursuant to which Plaintiff agreed to purchase a variety of telecommunications services from Defendant for resale to Plaintiff's customers. In March of 2006, Defendant sent Plaintiff an invoice that Plaintiff subsequently disputed. Plaintiff, in turn, asserted that Defendant had been withholding payments for access charges allegedly owed to Plaintiff dating back to March of 2005. Neither company agreed with the other's charges, thus giving rise to the underlying breach-of-contract disputes in this case.

In an effort to resolve their differences, the parties entered into a Dispute Resolution Agreement ("DRA") in late April or early May of 2006, pursuant to which they "agree[d] to submit [certain specified disputes] to arbitration." (Defendant's Motion, Ex. 1, DRA § 2(A).) Among other terms, the DRA cross-references a separate "Escrow Agreement" under which Plaintiff agreed to deposit $1.5 million into an escrow account, and further provides as follows:

> **D.     Arbitration Process**
>
> (1)     The Dispute shall be finally settled by arbitration in accordance with the commercial arbitration rules of the AAA as may be modified from time to time, unless otherwise modified by this Agreement or agreed to in writing by the Parties.
>
> (2)     The Parties shall mutually agree upon the selection of a single Arbitrator and the location for arbitration. In the event that the Parties shall be unable to so agree within fifteen (15) business days of the execution of this Agreement, the provisions of Section 3 shall govern.

* * * *

> (5) The Parties shall, subject to the approval of the Arbitrator, agree to a schedule that shall result in an arbitration hearing no later than ninety (90) days from execution of this Agreement and the issuance of an arbitral award no later than one hundred (100) days from the execution of this Agreement.

(DRA § 2(D).) Section 3 of the DRA, in turn, states:

> **3. Court Resolution.** In the event that the Parties do not mutually agree to a single Arbitrator within the time frame provided for in Subsection 2D(2) above, then: (a) the Parties shall direct the Escrow Agent to return the Escrow Amount to [Plaintiff]; (b) this Agreement shall become void; and (c) the Parties may pursue whatever recourse that they are entitled to under the CSA and the Tariffs.

(Id. § 3.)

In light of the DRA's 15-day deadline for the parties' selection of an arbitrator, the date of this agreement's execution is potentially relevant here. Yet, the record is murky on this point — most significantly, the DRA itself recites that it was "entered into this __ day of April, 2006," and otherwise is not dated — and the parties do not agree on the date the agreement was executed. Defendant asserts, without any apparent evidentiary support, that the DRA has an effective date of May 5, 2006.[1] Plaintiff, for its part, alleges in its complaint that the agreement is dated April 18, 2006. (See First Amended Complaint at ¶ 21.)[2] Plaintiff's view apparently rests upon (i) a provision in the accompanying Escrow Agreement reciting that the parties "have entered into a certain

---

[1] Under this view, the 15-business-day period for agreeing upon an arbitrator apparently would have expired on May 26, 2006.

[2] Plaintiff's reading of the record would result in a deadline of May 9, 2006 for the parties to agree upon an arbitrator.

Dispute Resolution Agreement dated April 18, 2006," (Plaintiff's Response, Ex. 2, Escrow Agreement at 1), and (ii) a fax transmittal date of April 18, 2006 on the counterpart signature page executed by Plaintiff, (see Plaintiff's Response, Ex. 1, DRA at 3).

In any event, it is quite clear from the record that by mid-May of 2006, the parties had yet to agree on an arbitrator. It also is clear, however, that Plaintiff's and Defendant's counsel had agreed to continue pursuing a resolution of this issue despite the possible expiration of the DRA's 15-day period for doing so. In a May 11, 2006 e-mail message to Defendant's counsel, for example, Plaintiff's attorney proposed the names of two arbitrators, suggested that the parties also might consider facilitation, and then stated:

> I had hoped that we would have already reached an agreement on an arbitrator and location by this time. I accept full responsibility for the delay — the passing of my father-in-law and related responsibilities caused a considerable backlog in my schedule. I believe I have now caught up, but in light of this, I am open to bumping the May 15 date if we need to do so to reach agreement in this regard.

(Plaintiff's Response, Ex. 7.) Defendant's attorney responded that same day, stating that he would consider facilitation, explaining the reasons for his prior suggestion of a particular Chicago-based arbitrator, William Hartgering, and stating that he had "no problem" moving the impending May 15 deadline "so that we can come to resolution on this." (Plaintiff's Response, Ex. 8.)[3]

---

[3]Notably, both attorneys referred to a May 15, 2006 deadline for selecting an arbitrator — a date which, as noted, is not consistent with *either* party's present position as to the date that the DRA was executed. This May 15 date evidently derived from a provision in an earlier draft

5

The parties' attorneys continued to address this matter in e-mail messages to each other and to third parties through the remainder of May and extending into July and August of 2006. These messages address such topics as (i) the possibility of facilitation, with arbitration to follow if it did not succeed, (ii) the possibility of using William Hartgering for facilitation *and* arbitration, in the event that the former did not lead to a resolution of the parties' dispute, and (iii) Mr. Hartgering continuing availability and acceptability as an arbitrator when two facilitation sessions with Judge Barry Howard in June and July of 2006 failed to produce a settlement. Notably, neither party's counsel made any mention in any of this correspondence of the possibility that the DRA might have become void by its own terms in light of the parties' failure to mutually agree upon an arbitrator within the initial 15-day limit or some extended time period.

Notwithstanding these ongoing discussions and efforts to resolve the parties' dispute, Plaintiff commenced the present action in state court on May 11, 2006, a date either within or just outside the DRA's initial 15-day period for agreement upon an arbitrator. According to Plaintiff's counsel at the time, he informed Defendant's attorney that Plaintiff would serve its complaint only upon the parties' failure to settle their differences or agree on a method of alternative dispute resolution. (See Plaintiff's Response, Ex. 6, Romzek 11/27/2006 Aff. at ¶ 4.) The complaint ultimately was served

---

of the Escrow Agreement that apparently called for the release of the escrowed funds if the parties had not agreed upon an arbitrator by May 15, 2006. This provision was deleted from the final version of the Escrow Agreement, however, apparently at the request of the escrow agent's counsel.

on or around August 3, 2006, and Defendant promptly removed the case to this Court on August 9, 2006. Following Plaintiff's October 10, 2006 filing of an amended complaint, Defendant filed the present motion in lieu of an answer, seeking a stay or dismissal of this suit in light of the parties' purported agreement to resolve their disputes through arbitration.

### III. ANALYSIS

**A.     The Standards Governing Defendant's Motion**

In seeking a stay or dismissal of this suit, Defendant relies on the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* which mandates that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see also Glazer v. Lehman Brothers, Inc., 394 F.3d 444, 450-51 (6th Cir. 2005). If, as Defendant contends, the claims asserted in Plaintiff's complaint are subsumed within an arbitration agreement entered into by the parties, then this Court "must stay the proceedings until the arbitration process is complete." Glazer, 394 F.3d at 451 (citing 9 U.S.C. § 3).

In resolving Defendant's motion, the Court must determine "whether the parties agreed to arbitrate" and "the scope of that agreement." Glazer, 394 F.3d at 451 (internal quotation marks and citation omitted). While "any doubts regarding arbitrability should be resolved in favor of arbitration," Glazer, 394 F.3d at 451, a party nonetheless "cannot be required to submit to arbitration any dispute that the party has not agreed to so

7

submit," Bratt Enterprises, Inc. v. Noble International Ltd., 338 F.3d 609, 612 (6th Cir. 2003). Rather, "[a]rbitration under the Federal Arbitration Act is a matter of consent, not coercion." Albert M. Higley Co. v. N/S Corp., 445 F.3d 861, 863 (6th Cir. 2006) (internal quotation marks and citation omitted).

"State contract law . . . governs in determining whether the arbitration clause itself was validly obtained, provided the contract law applied is general and not specific to arbitration clauses." Glazer, 394 F.3d at 451. In this case, the parties specified in the DRA itself that "[t]his Agreement shall be governed by the laws of the State of Michigan." (DRA § 2(D)(8).) Accordingly, the Court will apply Michigan contract law in ascertaining whether the parties agreed to arbitrate and, if so, the precise scope of their agreement.

**B.  Absent Their Mutual Agreement Upon an Arbitrator, the Parties Did Not Enter into an Enforceable Agreement to Arbitrate the Disputes Giving Rise to the Claims in Plaintiff's Complaint.**

The agreement upon which Defendant seeks to rely in its motion, the DRA, stipulates that the parties "agree to submit the Dispute to arbitration," and further provides that the parties "shall mutually agree upon the selection of a single Arbitrator and the location for arbitration." (DRA §§ 2(A), 2(D)(2).) The DRA imposes a 15-day deadline for reaching these latter agreements, after which the DRA "shall become void." (DRA §§ 2(D)(2), 3.) In support of its motion, Defendant contends that the parties waived the DRA's 15-day deadline, and thereafter reached an agreement upon an arbitrator that triggered their obligation to arbitrate their dispute in accordance with the DRA. While

8

the Court accepts the first of these propositions, it finds no evidence in support of the second. In the absence of such evidence of agreement upon an arbitrator, the Court cannot conclude that the parties have reached a binding, enforceable agreement to arbitrate the disputes reflected in Plaintiff's complaint.

Under familiar principles of Michigan contract law, the "primary goal in the construction or interpretation of any contract is to honor the intent of the parties," and this intent, where possible, must be "ascertained through the words used in the instrument." Clark Brothers Sales Co. v. Dana Corp., 77 F. Supp.2d 837, 843 (E.D. Mich. 1999) (internal quotation marks and citations omitted). Moreover, the "initial determination whether contract language is ambiguous is a question of law," and "if there is no ambiguity, the meaning of the contract likewise is a question of law for the Court to decide." Clark Brothers, 77 F. Supp.2d at 843. In this case, the pertinent portions of the DRA are sufficiently clear, and neither party contends otherwise. In particular, through their execution of the DRA, the parties evidenced their agreement to submit their disputes to arbitration,[4] conditioned upon their "mutual[] agree[ment] upon the selection of a single Arbitrator and the location for arbitration." (DRA § 2(D)(2).) The parties further committed themselves to reaching agreement upon an arbitrator and location "within fifteen (15) business days," with the DRA "becom[ing] void" if they failed to do so. (Id.

---

[4]The parties evidently agree, at least for present purposes, that the DRA's definition of the "Dispute" between the parties is broad enough to encompass the claims asserted in Plaintiff's complaint.

9

§§ 2(D)(2), 3.)

Yet, just as the parties were free to restrict themselves to a 15-day period within which to agree upon an arbitrator and location, they were free to mutually waive this limitation, provided that each of them voluntarily and intentionally abandoned its right to insist upon strict adherence to this term. See Quality Products & Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 666 N.W.2d 251, 253, 256-58 (2003). As Defendant observes, it is quite clear that they did so. In particular, Plaintiff's attorney stated in a May 11, 2006 e-mail message to Defendant's counsel that he was "open to bumping the . . . date" for agreeing upon an arbitrator and location, (Plaintiff's Response, Ex. 7), and Defendant's attorney responded that same day by stating that he "would have no problem moving [the deadline] so that we can come to resolution on" the selection of an arbitrator and location, (Plaintiff's Response, Ex. 8). In addition, the parties evidenced such a waiver through their course of conduct, where their attorneys continued to discuss the selection of an arbitrator after the expiration of the DRA's 15-day period, without once indicating that the DRA had become void as a result of the parties' failure to reach agreement on an arbitrator within the initial 15-day time frame or some extended period. See Quality Products, 666 N.W.2d at 258-59 (confirming that the parties' course of conduct can establish a waiver of a contractual provision).

Yet, as Plaintiff points out, such an extended deadline is of no moment unless the parties *eventually* agreed upon an arbitrator and location. Defendant does not contest this proposition, (see Defendant's Motion, Br. in Support at 11 (acknowledging that the DRA

"provides that the parties are to 'mutually agree' to an arbitrator"), but insists that the parties did, in fact, reach an agreement on these matters. In particular, Defendant points to four e-mail messages sent by Plaintiff's counsel, James Romzek. The first two of these, both dated May 19, 2006, were sent from Mr. Romzek to Laila Azzouz, an assistant to Judge Barry Howard, as part of a series of messages intended to work out the arrangements for facilitation with Judge Howard. In the first of these e-mail messages, Mr. Romzek stated:

> Our objective is to use facilitation to try to avoid a lawsuit. If that does not resolve the matter, then the parties have agreed to arbitrate. The arbitration will likely take place in Chicago, but we are hoping we can settle the matter through a one-day facilitation process. I look forward to hearing back regarding possible dates in June.

(Plaintiff's Response, Ex. 9.) In response, Ms. Azzouz asked whether the parties wished to facilitate in Chicago, and Mr. Romzek, in turn, replied:

> We want to facilitate in Michigan within the next 30 to 45 days. If that does not resolve the matter, we will arbitrate in Chicago, with a mutually agreed upon arbitrator, some time in late August or early September.

(Id.) Defendant views Mr. Romzek's statements as evidencing the parties' agreement upon William Hartgering as an arbitrator, where he evidently was the only Chicago-based arbitrator discussed by the parties.

Shortly thereafter, while the parties continued to arrange a date for a facilitation with Judge Howard, Mr. Romzek sent an e-mail message to Michael Shortley, Defendant's attorney, that Defendant views as further evidence of the parties' agreement

11

upon Mr. Hartgering. In a message dated May 23, 2006, Mr. Romzek stated:

> Do you have a phone number for Hartgering? [Plaintiff's] CEO would like me to talk to him so that he can comfortably agree to your proposal that the facilitation with [Judge] Howard is tied to the arbitration with Hartgering. Basically, he wants to make sure that Hartgering is not "in [Defendant's] camp[.]" Assuming that call goes fine, let's try to lock down some dates with both [Judge] Howard and Hartgering[.]

(Plaintiff's Response, Ex. 11.) Defendant maintains that this message demonstrates Plaintiff's agreement to facilitate with Judge Howard and arbitrate with Mr. Hartgering as a "package deal." (Defendant's Reply Br. at 3.)

Finally, Defendant points to an e-mail message sent by Mr. Romzek to Mr. Shortley on May 31, 2006, after the parties had agreed to a June 14, 2006 facilitation with Judge Howard but Plaintiff discovered that one of its representatives would be unavailable on that date. In lieu of simply rescheduling the facilitation, Mr. Romzek "propose[d] an alternative:"

> I did speak with Bill Hartgering's assistant and she has indicated that he would be available to facilitate this matter on either June 20, 21, 26, 28 or 30. Both [Plaintiff's] representatives and I can be available on those dates. Hartgering also would be willing to serve as arbitrator thereafter if the matter did not settle. He did indicate that either party should have the right to preclude him from serving as arbitrator if they so elected after facilitation. But he has done this before and, according to him, effectively. In the process of checking into his background, I have learned that he has a good track record at reaching a resolution by way of facilitation or mediation in advance of arbitration. Quite frankly, based on what I have learned, I think we stand a better chance of resolving this with him in a one day facilitation than we do with the Hon. Barry Howard. If you and your folks are willing to proceed in this fashion and are available to do so, I think we should lock down one of the earlier dates with Hartgering's office. The 6 or 7 day delay (June 20 or 21 versus June 14) is immaterial if we are able to resolve the dispute, and I think we should give ourselves the best shot at

doing so.  Let me know what you think.

(Plaintiff's Response, Ex. 12.)[5]

Upon reviewing this record, the Court finds that it fails to establish a meeting of the minds as to the selection of Mr. Hartgering as an arbitrator.  To the contrary, this series of e-mail messages reflects that the selection of an arbitrator remained very much in play throughout the parties' discussions in the spring and summer of 2006.  Mr. Romzek's two messages to Judge Howard's assistant on May 19, 2006 state only that the parties had agreed to arbitrate *in Chicago*, while emphasizing that this arbitration would take place "with a mutually agreed upon arbitrator." (Plaintiff's Response, Ex. 9.)  As Plaintiff correctly observes, the DRA requires the parties' agreement upon *both* the "selection of a single Arbitrator" *and* the "location for arbitration." (DRA § 2(D)(2).)  Thus, Plaintiff's apparent agreement upon a location for arbitration does not, by itself, evidence its agreement to retain Mr. Hartgering as an arbitrator.  Indeed, Defendant's attorney, Mr. Shortley, acknowledged this distinction in an earlier e-mail message, explaining that his suggestion of Mr. Hartgering as an arbitrator was motivated in part by considerations of location, as this would result in arbitration in the "neutral forum" of Chicago rather than Detroit.  (Plaintiff's Response, Ex. 8.)  Plainly, then, Plaintiff could have agreed to this "neutral forum" without necessarily agreeing upon Mr. Hartgering.

---

[5]The record does not include any response by Mr. Shortley to this proposal.  For whatever reason, however, the parties did not use Mr. Hartgering as a facilitator, but instead participated in two facilitation sessions with Judge Howard in June and July of 2006.

In fact, Mr. Romzek's subsequent May 23, 2006 e-mail message tends to confirm, rather than refute, the absence of an agreement upon Mr. Hartgering, at least at that point. In the May 23 message, after all, Mr. Romzek asked for Mr. Hartgering's phone number so that he could "talk to him" and "make sure that Hartgering is not 'in [Defendant's] camp.'" (Plaintiff's Response, Ex. 11.) This was stated as an express precondition to Plaintiff's concurrence in Defendant's "proposal that the facilitation with [Judge] Howard [be] tied to the arbitration with Hartgering," with Plaintiff agreeing to go forward only if "that call [to Mr. Hartgering] goes fine." (Id.) Notably, Defendant has not produced any subsequent e-mail message from Mr. Romzek indicating that Plaintiff's contact with Mr. Hartgering *had* "go[ne] fine" and that Plaintiff was prepared to accept the proposed "package deal" of facilitation with Judge Howard followed by arbitration with Mr. Hartgering.

Rather, Defendant instead points to Mr. Romzek's May 31, 2006 e-mail proposing that the parties use Mr. Hartgering as *both* a facilitator *and* an arbitrator. Again, however, this message seemingly disproves, rather than establishes, Plaintiff's acceptance of a "package deal" consisting of facilitation with Judge Howard and arbitration with Mr. Hartgering. Moreover, while Mr. Romzek did observe that his "process of checking into [Mr. Hartgering's] background" had led him to conclude that Mr. Hartgering had a "good track record," this statement expressly referred to, and clearly was meant to support, Plaintiff's latest proposal of "facilitation or mediation in advance of arbitration." (Plaintiff's Response, Ex. 12.) Even then, Mr. Romzek relayed Mr. Hartgering's own

14

advice that "either party should have the right to preclude him from serving as an arbitrator if they so elected after facilitation." (Id.) Thus, even if Defendant had accepted Plaintiff's proposal to use Mr. Hartgering for both facilitation and arbitration — and, as noted, this proposal clearly was not accepted, as the parties reverted to their earlier plan to use Judge Howard as a facilitator — this proposal apparently would have allowed either party to revoke its acceptance of Mr. Hartgering as an arbitrator after the conclusion of the facilitation.

In sum, the record lacks any evidence of Plaintiff's unequivocal acceptance of Mr. Hartgering as an arbitrator.[6] Rather, the record discloses a series of offers and counteroffers to engage in various sorts of dispute resolution, some of which involved

---

[6]It should be noted that, beyond the various e-mail messages discussed above, the record includes the declaration of Defendant's attorney, Michael Shortley, which was attached as an exhibit to Defendant's reply brief in support of its motion. In this declaration, Mr. Shortley asserts that he "reached an agreement with Mr. Romzek to use Mr. William Hartgering as an arbitrator," and he indicates that this agreement was reached at some point before the parties discussed the possibility of using Mr. Hartgering as a facilitator. (Defendant's Reply Br., Ex. A, Shortley Decl. at ¶ 3.) Yet, Mr. Shortley does not identify the basis for his assertion that Mr. Romzek agreed to use Mr. Hartgering as an arbitrator. Nor does he cite any specific communication, whether within the various e-mails authored by Mr. Romzek or elsewhere in the record, as support for his belief on this point.

Accordingly, the Court need not accept Mr. Shortley's conclusory assertion on this point, as it evidently rests solely upon his subjective belief rather than any objective manifestation of Plaintiff's assent to Defendant's proposal of Mr. Hartgering as an arbitrator. See Kamalnath v. Mercy Memorial Hospital Corp., 194 Mich. App. 543, 487 N.W.2d 499, 503 (1992) (explaining that, under Michigan law, a meeting of the minds is judged by objective evidence and not the parties' subjective states of mind); Heritage Broadcasting Co. v. Wilson Communications, Inc., 170 Mich. App. 812, 428 N.W.2d 784, 787 (1988) (same). Moreover, because the Court has discounted Mr. Shortley's declaration, it need not address Plaintiff's contention, advanced in a separate motion, that this declaration should be stricken as an improper attempt to raise new issues for the first time in a reply brief.

Mr. Hartgering and some of which did not. Because the parties' obligation under the DRA to arbitrate their dispute was expressly conditioned upon their mutual agreement on an arbitrator, and because there is no evidence of such an agreement, the Court finds no basis for concluding that the parties are bound under the DRA to submit their dispute to arbitration. It follows that Defendant is not entitled to the stay sought in its motion.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion to dismiss or stay proceedings pending arbitration is DENIED. IT IS FURTHER ORDERED that Plaintiff's motion to strike the declaration of Michael J. Shortley is DENIED AS MOOT.

Next, in light of the Court's disposition of Defendant's motion, IT IS FURTHER ORDERED that Plaintiff's motion for a status conference is DENIED AS MOOT. Rather, the Court will convene a scheduling conference upon Defendant's filing and service of an answer to Plaintiff's amended complaint. Similarly, IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment is DENIED WITHOUT PREJUDICE, with Plaintiff remaining free, if desired and appropriate, to renew its request for summary judgment following the close of discovery.

                                                    s/Gerald E. Rosen
                                                  Gerald E. Rosen
                                                  United States District Judge

Dated: September 24, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 24, 2007, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry<br>Case Manager